# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### MANHATTAN

Gloria Miramontes, individually and on behalf of all others similarly situated,

                Plaintiff,

      - against -

Ralph Lauren Corporation,

              Defendant

1:22-cv-04192

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.     Ralph Lauren Corporation ("Defendant") sells women's burgundy lightweight v-neck sweaters marketed as made entirely from Pima cotton under the Polo brand ("Product").



2.    The neck tag identifies the Product as "Washable" and "Pima Cotton."



3.    One of the Product's hang tags states, "Fine luxurious yarns crafted from Pima Cotton fibers distinguish this signature design, knit in a fine gauge stich for lightweight comfort and an exquisitely soft hand."



4.    "Cotton," from the genus *Gossypium*, refers to the part of the cotton plant that grows in the boll, the encasing for the fluffy cotton fibers.



5.      Numerous types of cotton are grown commercially worldwide, such as upland cotton, extra-long staple cotton, tree cotton and Levant cotton.[1]

6.      Different types of cotton have different characteristics, such as strength, softness, and fiber length.

7.      The main criteria to identify the type of cotton is the fiber length.

8.      The length of cotton fibers affects its qualities and price, because the longer the fiber, the stronger, softer, and more durable the resulting fabric.

9.      Pima cotton is a type of extra-long staple ("ELS") cotton with a range of 1.2 inches to 1.48 inches.

10.     According to the United States Department of Agriculture ("USDA"), the average length of Pima cotton fibers is 1.3125 inches. 7 C.F.R. § 28.304.

11.     Pima cotton was developed by the USDA in 1951 and is grown in California, Arizona, Texas, and New Mexico.

12.     Since cotton with longer fibers are more expensive, there is great incentive to mix

---

[1] *Gossypium hirsutum*, *Gossypium barbadense*, *Gossypium arboretum* and *Gossypium herbaceum*.

cotton byproducts and shorter fibers with higher value longer fibers.

13.    Pima cotton products are costlier than those made of shorter types of cotton.

14.    Consumers value products made from Pima cotton because they are softer and more durable than products made from non-Pima cotton.

15.    The American Society for Testing and Materials ("ASTM") developed the Single-Fiber Test to determine fiber lengths in finished cotton products such as sheets and clothing.[2]

16.    The Single-Fiber Test was applied to Plaintiff's Product. Exhibit A, TexTest Report 9701.



17.    The results revealed that (1) 100% of the fibers were shorter than 1.20 inches (30.48 mm), the low end of the range for Pima cotton and (2) 88% of the fibers were shorter than 1.08

---

[2] ASTM D5103, Standard Test Method for Length and Length Distribution of Manufactured Staple Fibers.

inches (27.432 mm).

| FIBER LENGTH AND DISTRIBUTION ASTM D 5103 | | Length Group Lower Limit (in.) | Number of Fibers | Percent of Total | |
|---|---|---|---|---|---|
| | | 2.040 | 0 | 0 | |
| | | 1.920 | 0 | 0 | |
| | | 1.800 | 0 | 0 | |
| | | 1.680 | 0 | 0 | |
| Extra Long | | 1.560 | 0 | 0 | Probability |
| Long | | 1.440 | 0 | 0 | 0% PIMA Cotton |
| Medium | | 1.320 | 0 | 0 | |
| Short | | 1.200 | 0 | 0 | |
| | | 1.080 | 12 | 12 | |
| | | 0.960 | 19 | 19 | |
| | | 0.840 | 31 | 31 | |
| | | 0.720 | 31 | 31 | |
| | | 0.600 | 7 | 7 | |
| | | 0.480 | 0 | 0 | |
| | | 0.360 | 0 | 0 | |
| | | 0.240 | 0 | 0 | |
| | | 0.120 | 0 | 0 | |
| | | 0.000 | 0 | 0 | |
| | | | 100 | 100 | |
| Total | | | | | |
| Average Length | | 0.900 | | | |
| Standard Deviation | | 0.13 % | | | |
| Coefficient of Variation | | 0.147 % | | | |

18.    The TexTest Report was reviewed by Dr. Sabit Adenur, a professor who specializes in textiles and has written textbooks on these subjects.

19.    Dr. Adenur concluded that even if all of the fibers were shortened by 25% during the manufacturing processes, the total number of fibers that would qualify as Pima cotton would be 62%. Exhibit B, Adenur Report.

| | As Tested | | Prior to Manufacturing Processes |
|---|---|---|---|
| | Length Group Lower Limit (inch) | Number of Fibers | Length Group Lower Limit (inch) |
| | 2.040 | 0 | 2.720 |
| | 1.920 | 0 | 2.560 |
| | 1.800 | 0 | 2.400 |
| | 1.680 | 0 | 2.240 |
| | 1.560 | 0 | 2.080 |
| Pima Cotton Range | 1.440 | 0 | 1.920 |
| | 1.320 | 0 | 1.760 |
| | 1.200 | 0 | 1.600 |
| | 1.080 | 12 | 1.440 |
| | 0.960 | 19 | 1.280 |

5

| | | |
|---|---|---|
| 0.840 | **31** | **1.120** |
| 0.720 | 31 | 0.960 |
| 0.600 | 7 | 0.800 |
| 0.480 | 0 | 0.640 |
| 0.360 | 0 | 0.480 |
| 0.240 | 0 | 0.320 |
| 0.120 | 0 | 0.160 |
| 0.000 | 0 | 0.000 |
| Total: | 100 | |

20.     The 62% is arrived at by adding the number of fibers – 12 + 19 + 31 – within the range of 1.120 and 1.440, shown in column four.

21.     Dr. Adenur noted that this conclusion assumes that all 31 fibers longer than 1.120 inches are equal to or greater than 1.200 inches, the minimum length for Pima cotton, which is statistically improbable.

22.     For numerous reasons, it is unlikely the cotton fibers used in the Product were reduced in size by 25% from the time the cotton was harvested until it was analyzed.

23.     Cotton fibers can be reduced in size by ginning, a two-stage mechanical process which removes gin trash, such as stems, burrs, soil, and other debris, from the cotton bolls and separates the cotton fibers from the seed.

24.     In studies on upland cotton, the average length decrease from ginning was only 3.9%.

25.     However, upland cotton uses saw ginning, an intensive process that can be destructive to cotton fibers.

26.     In contrast, Pima cotton is processed through roller ginning, which is gentler to cotton fibers than saw ginning, and results in no meaningful shortening of the fibers.

27.     After ginning, the cotton is dyed and steamed.

28.     That this step does not have a significant impact on fiber length is shown because

only one study reported that a raw stock vat-dyeing process reduced fiber length, and only by a slight amount.

29.    The final pressing of finished cotton rarely reduces the fiber length, because it is done in moist conditions which reduce the brittleness of the fibers and increase their tensile strength.

30.    After the cotton is made into a finished product, the fibers can be shortened through pilling, when the fibers break, tangle and "ball up."

31.    Pilling is also more common with shorter and synthetic fibers, which is why Pima cotton, with longer fibers, is not prone to pilling.

32.    Even when manufacturers apply anti-pilling treatments to remove protruding fibers to prevent pilling, any reduction in fiber length would be *de minimis*.

33.    This is because the fiber protrusion from the fabric is usually not significant.

34.    Since Plaintiff's Product was new and unused, there could not have been shortening of the fiber lengths due to wear.

35.    Since Plaintiff's Product had not been worn or washed, the length of the fibers did not shrink.

36.    Assuming the worst case scenario of fiber shortening such that only 62% of the fibers qualified as Pima Cotton, this is still significantly less than advertised, as the Product purports to be only Pima Cotton.

37.    The TexTest Report supports the strong inference that the cotton used in the Product is not only Pima cotton but contains a significant amount of less expensive shorter cotton fibers and cotton byproduct fibers.

38.    The failure to disclose the presence of less Pima cotton than advertised is contrary to the Textile Fiber Products Identification Act ("Textile Act") and its regulations. 15 U.S.C. §§ 70,

*et seq.*; 16 C.F.R. § 303.15(b).

39.    Defendant makes other representations and omissions with respect to the Product which are false and misleading.

40.    Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

41.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

42.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

43.    Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

44.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $39.99, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

45.    Jurisdiction is pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

46.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

47.    The Product has been sold at thousands of locations in the states covered by the classes Plaintiff seeks to represent, with the representations challenged here, for at least 10 years.

48.    Plaintiff Gloria Miramontes is a citizen of Texas.

49.    Defendant Ralph Lauren Corporation is a Delaware corporation with a principal place of business in New York, New York County, New York.

50.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

51.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

52.    Venue is in the Manhattan in this District because a substantial part of the events or omissions giving rise to these claims occurred in New York County, such as Defendant's decisions for labeling the Product.

53.    Venue is in this District because Defendant resides in this District.

<u>Parties</u>

54.    Plaintiff Gloria Miramontes is a citizen of El Paso, El Paso County, Texas.

55.    Defendant Ralph Lauren Corporation is a Delaware corporation with a principal place of business in New York, New York, New York County.

56.    Defendant is one of the largest sellers of clothing in the world.

57.    Defendant sells its clothing to consumers from its Ralph Lauren Polo mainline stores and outlets, third-parties such as Macy's, and online.

58.    The Polo Ralph Lauren brand is synonymous with the highest quality, so consumers expect the products it sells to live up to their word.

59.    Plaintiff purchased the Product at the Polo Factory Store, 7051 S Desert Blvd El Paso, TX 79932, on November 9, 2019.

60.    Plaintiff believed and expected the Product contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

61.    Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

62.    Plaintiff bought the Product at or exceeding the above-referenced price.

63.    Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

64.    Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

65.    The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

66.    Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

67.    Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar Pima cotton clothing, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

68.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Texas Class:** All persons in the State of Texas who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of New York, Connecticut, New Hampshire, Indiana, Virginia, Montana, Wyoming, Idaho, Alaska, Vermont, Georgia, Iowa, Minnesota, Delaware, Mississippi, Tennessee, Arkansas, South Carolina and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

69.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

70.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

71.    Plaintiff is an adequate representative because her interests do not conflict with other members.

72.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

75.    Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

76.   Plaintiff incorporates by reference all preceding paragraphs.

77.   Plaintiff believed the Product contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

78.   Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

79.   Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

80.   Plaintiff relied on the representations and omissions to believe the Product contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

81.    Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

82.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

83.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

84.   Defendant intended that members of the Consumer Fraud Multi-State Class would

rely upon its deceptive conduct.

85.    As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

86.    Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.

87.    The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

88.    Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

89.    Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

90.    Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

91.    Defendant's representations affirmed and promised that the Product contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

92.    Defendant described the Product so Plaintiff believed it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton, which became part of the basis of the bargain that it would conform to its affirmations and promises.

93.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

94.    This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

95.    Plaintiff recently became aware of Defendant's breach of the Product's warranties.

96.    Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

97.    Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

98.    Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

99.    The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

100.    The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

101.  The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

102.  Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

103.  Defendant had a duty to truthfully represent the Product, which it breached.

104.  This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high quality products.

105.  Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

106.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

107.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

108.  Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

109.  Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

110.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained cotton that was only Pima cotton, because the neck tag said Pima cotton and the hang tag described only Pima cotton.

111.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

112.   Defendant knew of the issues described here yet did not address them.

113.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

114.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   May 22, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

Aaronson Law Firm
Michael L. Aaronson*
7362 Remcon Cir
El Paso TX 79912
Tel: (915) 241-7590
mikeaaronson@gmail.com
*Pro Hac Vice Application Forthcoming